Case 22-5459, United States of America v. Ricardo Alvarado. Argument not to exceed 15 minutes per side. Mr. Paulson, you may proceed for the appellant with your introductions. Good morning. May it please the court. Good morning. My name is Colter Paulson of Squire Patton Boggs and the Sixth Circuit Clinic and today I'm here to present two of our students for argument. Tess Chaffee and Pat Manning will be arguing for Mr. Alvarado today. All right. Thanks very much. Appreciate your help here. All right. Welcome. I take it you're taking one of the issues or are you thinking of preempting your friend and just doing the whole thing? I'll be taking the sentencing issue. All right. Great. Good morning. May it please the court. Tess Chaffee on behalf of Ricardo Alvarado. I'll be taking six minutes and reserving one minute for rebuttal and my colleague will take the remaining nine minutes and reserve two for rebuttal. Perfect. Thank you. Under this court's decision in United States v. Mucs applying Tennessee law, when a weapon is discharged into the air outside of a residence, that does not place the individuals inside the residence in the zone of danger. The government bears the burden in this case to provide evidence that at least one person was present in the zone of danger. That Mr. Alvarado fired the weapon towards an individual or that at least one person was outside and in the direction of the gunfire. Can I ask you a question just to make sure I'm getting where the bullets are? So if I understand this evidentiary scene correctly, there were two spent, i.e. fired bullets, two live, i.e. not shot bullets found. And I thought one of the spent ones, i.e. fired, makes it seem pretty reasonable to conclude it was fired from inside the dwelling outside through the door. Am I right that that's a fair thing to say about one of the spent bullets? Yes, there were two shells recovered. One was on the back patio and the other was in the threshold of the doorway. So can I just go to my next point and if you're nervous you should be because this is not a friendly question. What strikes me as hard about the zone of danger point is if I imagine someone shooting from within a dwelling through a door, I've kind of ruled out the possibility all they're doing is just firing it into the air which truly is not within the zone of danger unless there's a drone, plane or bird. But if you're in a community of other homes, I'd be stunned if the state law rule was you're just firing in the direction of lots of other homes and you're supposed to find out whether someone was there. That would stun me to no end. So my problem with the zone of danger argument is I think a shot from inside a dwelling out to a community, that's reckless and the statute covers that. So how do you respond to my slightly sympathetic but also unfriendly question? The evidence indicates that it was fired through the doorway outside. It doesn't indicate that it was fired into the home, inside of the home. I get the point that if you're firing outside the home, you're not putting people in the home at risk. I don't call it a big compliment to our law-abiding person that they're firing into a community. So this home is on the edge of the property and in front there's an open field. So he very well could have fired just straight out into the open field in the opposite direction of any of the homes. I'm sorry. I thought from looking at the officer's camera, I thought there were homes in the vicinity looking out the door. There are other homes in the area. This one was on the edge of the property and the patio is off to the side and then in front of that there is no other home. It's just an open field. You couldn't reach it from the door. You couldn't shoot outside the door and hit anybody except a field? Unless you were firing back in the opposite direction. Or straight up into the air. Go ahead Judge Mathis. Do we know what direction the defendant was shooting? We do not. The government has offered no witnesses to the gunfire. Only people who heard the sound of the gunfire. And the Tennessee law is very clear that in order to be in the zone of danger, the weapon has to be fired in your direction or if it's fired up into the air, you have to be outside in that immediate area. So just to make sure we're on the same page, I'm just going to have to go back and look at the cam and make sure I'm getting this. But would you agree it is zone of danger if there is a community within range? A community where there are houses where there is actually someone there is not part of the evidentiary burning? In other words, you just can't be shooting where there are houses? No, Your Honor. The question is whether the government has identified a person that is in the zone of danger. I see. So under your theory, you can just fire where there are houses. If you don't see anyone and the officers don't point to a person outside, that's not zone of danger? That's correct, unless you're firing towards one of them. What's your best case on the point I just made? Directly on that. State versus Fox. And in that case, the defendant fired into the air outside of an apartment building? Into the air is not answering that point. I'm imagining shooting towards houses. You're that's not zone of danger unless you show a person walking between houses or show there was a person in the house. That's the way I'm taking your argument. If you're firing toward a home, then yes, that would be placing people in the zone of danger. But there's no... Whether occupied or not. Whether they know whether there's someone there or not, right? It's enough that there was a home in the vicinity. Yes. Section 3913.103.B.3 does have a separate class of felony for firing into a residence. Whether it's occupied or not depends on the class of the felony. But doesn't someone have to be in fear of serious bodily injury or death? And how would that take place if no one's in the house? The question isn't whether someone feared injury. It was whether they faced a reasonable probability of imminent danger of serious bodily injury or death. It doesn't criminalize just scaring people with the sound of gunfire. It has to actually be fired in their direction and placing them in danger. What's your theory of the second spent shot? The one that's found outside? I think the evidence indicates that the two shots were fired from the porch or from within the doorway of the porch out into the air somewhere. But we don't have... The point being what? To just show, I mean, business? What was the point of the firing? There's no evidence to indicate why the shots were fired on this occasion. Just that there were two shots fired. And you wouldn't have felt at risk had you been in the home? The girlfriend? Well, the question isn't whether you would feel at risk. It's whether you actually do face that reasonable probability of imminent danger. That's the zone of danger. That's correct, Your Honor. And it's not the zone of danger. Like I must say, I feel in peril when I'm behind someone and they're shooting the other direction and they're out of control. I don't say to myself, hey, don't worry, Johnny. It's going to work out fine. He's just aiming the other way. There's a case, State v. Baldwin, where the defendant fired a shot inside of a restaurant towards one individual but did not recklessly endanger another person standing behind the defendant because they were not in the direction of the gunfire. What's the name of that case? State v. Baldwin. Well, we haven't let you give your speech. Did you have any other points that are just really wonderful points and we would be at risk of error if we didn't hear them? Well, the district court only placed three people in the zone of danger. One was Ms. Martinez and she told the police that Mr. Alvarado never pointed the weapon toward her and she didn't even know where he was at the time the shots were fired and guessed he was outside, implying that she was somewhere within the home. And there's no evidence to indicate that Mr. Alvarado fired toward the home. And Ms. Hufflin, another of the witnesses, she was inside her home watching TV at the time the shots were fired and the government has offered no evidence to indicate that he fired toward her home either. And the only other person that the district court identified as being in the zone of danger was Caleb Smith and he testified to being down the road at the store at the time the shots were fired and only heard about them through a phone call. And so the district court placed three different people in three different directions all in the zone of danger without any evidence as to what direction the bullet was fired. And in State v. Fox, the Tennessee court recognized the absurd and unreasonable results that would occur from finding reckless endangerment under any circumstances where anyone might possibly be struck by a stray bullet. So the gun has to be fired in someone's direction and here the government hasn't offered any evidence as to what direction the gun was fired, that he ever pointed it toward any person or that anyone was outside at all at the time the shots were fired. So you're not allowed to, because this is not beyond a reasonable doubt inquiry, right? Isn't this preponderance inquiry? That's correct. I mean, I guess there's a part of me that just finds it really strange that you have to have an eyewitness that says, hey, here was the angle of the gun. I mean, it's very hard to find the actual bullet as opposed to the spent shell. And if you don't have someone showing the angle of the gun, you don't show anyone was hurt and you can't show a bullet hole in a house, you never can invoke the statute. And it does seem to me that there's a bit of a common sense component to this, that after a couple rounds are fired, we decide this is reckless endangerment. I mean, I guess Second Amendment people might not like that and that will be the second argument, but I would have thought we live in a society where we're pretty comfortable saying it's reckless endangerment to start wandering around firing shells without having someone that says, oh, the angle is 45 percent. That's dangerous. Oh, but this one was 60 percent. We're good. It probably just went 10 feet over the house. Don't worry about it. We don't have mass killings in this country. Well, the government doesn't have to offer a precise angle of the gun, just the general direction of the gunfire. Yeah, but that requires an officer on the scene. They come after these encounters. They're not usually there. If they're firing and the officers are there, they usually don't end well. So these are cases almost necessarily where there's not officers on the scene and maybe there could be witnesses that actually see it, but this is a good example. There was no witness that saw the angle, right? That's correct. But in every single one of these reckless endangerment cases, there is evidence that the gun was fired in the direction of a person or that if the gun was fired into the air that there was someone outside in that immediate area. And in this case, we just don't have that evidence. But the only way to get it is without, is finding the actual bullet or holes in houses, right? Or just someone observing the shots being fired. Yeah, right, right. A witness. Yes. There does need to be some type of evidentiary basis. In United States v. Mucs, that- How many shots could you fire? I mean, how about it's 10 rounds. Is there some number of shots where we decide, well, we really don't need to know the angle? This is really outrageous. This case only involved two shots. No, no. Okay, yeah. So hypothetical. Is there some number of shots where we decide, gosh, if you're going to be firing a machine gun 50 rounds, we're not going to sit there and say, what's the angle? Where's the witness? Where's the bullet hole in the house? Isn't there some quantum where you would say, okay, enough is enough? In other words, your argument really works with one shot, maybe two, but there's some number where we kind of have to say that's reckless endangerment in this world. I'm not aware of any specific number of shots that need to be fired to find that. But if it was fired in an area where there are people walking around outside in that area, then that is sufficient to find reckless endangerment. But in this case, we don't have a single person outside at the time, or a single person testifying to him firing in their direction, or even straight up into the air. Any other questions? Nope. Okay, well, we'll hear from your compatriot. Thank you, Your Honor. I see why you guys did the first argument first. You didn't want us thinking about the Second Amendment, did you? May it please the Court, Patrick Maney for Appellant, Mr. Alvarado. Bruin expressly rejected the standard that was in place at the time of Mr. Alvarado's trial. Under Johnson, when the law changes, it's sufficient that an error be plain at the time of the appeal. Mr. Alvarado's conviction was plain error because Bruin changed the test, and because the government cannot meet its burden under the new test. You say it's plain error. I believe in your brief, you indicated there are no Sixth Circuit opinions that have found 922G to be unconstitutional as applied to nonviolent felonies. So how do we get to plain error? Even assuming that there's an error, how do we get to plain error if there's no Sixth Circuit cases or Supreme Court cases addressing this? So as far as we can tell, all prior 922G1 cases in this circuit have been decided based on the presumptively lawful dicta from Heller, which we think Bruin expressly rejects because Bruin says the only way that a court can conclude that an individual's conduct falls outside of the Second Amendment's unqualified command is by looking at the historical inquiry. But we think that U.S. v. White instructs what this court should do in this case. In that case, you had an intervening change in the law prior to the appeal, and then this court acknowledged that its precedent needed to be reconsidered, and it applied the new test from Borden, the intervening case. The same thing should happen here with Bruin. In U.S. v. Barnett, in that case, the change in the law... I must say, pre-Borden, there was a lot of confusion about what to do. So that does strike me as a little different. I was one of the people that wrote those decisions, so I do remember thinking we were really struggling over that. Sure. Well, again, though, I think still this court should apply the test from Bruin, especially in light of, in U.S. v. Barnett, the change in the law, too, was in and of itself enough to satisfy the first two elements of plain error. So under the test from Bruin, the government cannot meet its standard because the government can't meet its burden, because the government can't identify a tradition that disarms nonviolent felons. So it can't point to a distinctly similar statute to 922G1. But even under the more deferential, relevantly similar statute, standard, it can't point to any statutes that burden the right in a similar way for a similar reason. So your test is nonviolence versus dangerousness? So we think that violence is a subset of danger. We think that the common thread throughout all of the historical statutes or regulations are either violence or a risk of rebellion. This is kind of the danger test that Judge Beebus has endorsed in his philosophic dissent. Judge Barrett says something very similar. The Daniels Court in the Fifth Circuit essentially uses the same thing. But the violence is the pertinent. I don't think anyone thinks that Mr. Alvarado is going to go propagate rebellion. But Murhimi suggests that dangerousness is a pretty important inquiry. And what your co-counsel just said, you could see some dangerousness here. Well, so 922G1 requires predicate felonies to trigger. So what occurred that day doesn't matter for the 922G1 issue. But with respect to violence, I mean, none of the statutes that our friends point to disarm nonviolent people. I mean, the statutes that disarm loyalists, for example, loyalists were an enemy of the society, right? Catholics during the French and Indian War, same thing. You're disarming a domestic enemy, not trying to prevent crime generally. I thought the government's argument was really just a disloyalty to the rule of law. I think that is the government's argument. But the problem with that is that Brewer rejects just kind of this sweeping deference to Congress. So we think that test is way too deferential. With respect to forfeiture laws, those were temporary. Courts, you know, Congress, legislatures could disarm, if you committed a crime, they could take away the instrument of that crime. But it wasn't a permanent disarmament. The government points to the fact that certain felonies were punishable by death at the founding. Just because someone could have been executed at the founding for their crime does not mean that they would lose out on all their rights if they weren't sentenced to death. And certainly, a crime punishable by death at the founding isn't comparable to a crime that is for a term of years today. Marijuana possession and DUI are nonviolent. So the Supreme Court is- Remind me the timing of Bruin versus the timing of the crime, the timing of sentencing. OK, so Bruin, so the predicate felonies occurred in 2007 and 2010. He was arrested in 2020. I believe he was sentenced and then Bruin was handed down prior to his appeal. So sentencing occurs before Bruin? Sentencing occurs- A month before Bruin. I believe that's correct, Your Honor. I don't have the record. I mean, isn't that the hardest part? I mean, just the idea of saying to a district court judge, plain air for not appreciating what was about to happen? Well, again, I think that this court was comfortable holding that there was plain air in U.S. v. White. So again, I think the same thing applies here. Certainly, no one could have predicted how Bruin was going to come down. But, you know, we're hamstrung by plain air, but there's no way that we could have, you know, raised this at trial. Wait, I guess that I'm not so sure about. I would have thought a lot of lawyers are not, you guys weren't involved, so that's not my point. But do you think lawyers weren't aware of the Bruin litigation? Well, again, I think that, you know- Post Heller, there was a lot of, Post Heller, there was a lot. I mean, obviously, there's been a lot since Bruin. I thought there were a fair number of folks that were engaged in this. I just think that precedent in this circuit was settled, and there was, you know, everyone relied on the presumptively lawful language. Right. Thank you. Thanks very much. You all get your rebuttal. We'll hear from the government. Mr. Fitzpatrick. May it please the Court, Sam Fitzpatrick for the United States. I'm happy to answer any questions that the Court might have about any topic, but I would like to focus my remarks on the specific issues raised by my colleagues. Number one, whether or not the error here was plain. Number two, the nation's historical tradition of firearm regulation. And number three, whether the sentencing enhancement properly applied. Who bears the burden of a sentencing enhancement? The United States bears the burden. The government does, doesn't it? Yes, Your Honor. And what evidence is there in the record that would suggest that someone was in the zone of danger for the shots that were fired either from the step into the house, the doorway, or from the porch or patio area? The best evidence, Your Honor, is the defendant's wife's reaction to the gunfire. And her reaction to the gunfire was not to say, I think I hear gunfire somewhere or somebody somewhere is shooting. Instead, her reaction to the gunfire was to turn away and to shield her baby. Well, okay, so I'm strolling my child down the road and I hear gunfire in the distance. If I am afraid for my child, which is a very, is the very reaction I would have expected her to do, to shield herself or them because she hears a weapon. So if I'm doing that on a public street, is the person who was shooting at the other end of the block into an open field now subject to this kind of enhancement? In that hypothetical that you've just described, possibly not. But we know in this case that the defendant's wife was so close to the gunfire that her ears were ringing. Well, but she is close to them, but the question is eminence of danger in the zone of danger. I'm struggling with how you can say I was, I was so near that I was afraid even though the gun was pointed. Let's say we all agreed, everyone saw the gun pointed in a completely different direction out in a field. And you still have this reaction by somebody. You're saying the reaction of the populace around is the governing tool for determining whether the government has made its case for what is it, a four-level enhancement? The hypothetical that you're, that you've proposed, Your Honor, where the defendant is firing a gun into an open field and there's somebody in the exact opposite direction. No, behind them. Behind them? Five feet behind them. Near, scared, near, but not in the zone of danger. What's the answer? The answer is that if somebody is in the immediate vicinity of reckless gunfire, they're in the zone of danger. So what's the authority for it being relevant which direction the gun is faced? I'm not sure. The whole fight here is are you in zone of danger if you're shooting a gun near someone but not in their direction? And it sounds like you have to concede it was not in her direction. It was just very close to her so that a turn makes all of us, so what does zone of danger mean? Does it mean that you're close or does it mean you're actually within the direction of the fire? That's what we're trying to figure out. The zone of danger means that there's a reasonable probability that you're in danger. And to answer your question, the best case to show, the government does not concede that the weapon was not fired at her. We don't have an eyewitness because she was so afraid, she turned away from the gunfire. But what do you have to show? But it didn't, you would have a hole inside the dwelling. If he fired in any way towards her, you would be shooting inside and there would clearly be a hole, right? Bullet hole somewhere. Most likely, your honor, yes. So I feel like on this record, we have to assume one shot is on the porch, not inside. Now one shot is from inside. That's the one that seems really difficult. And I can't figure out if part of me thinks you're right. It's very much in the zone of danger to be five feet away from someone shooting a gun from inside the same dwelling. But you have this language in these cases where zone of danger does have this suggestion that what's reckless is the direction you're shooting, not the fact of shooting. A few comments on that, your honor. First, at the sentencing hearing, the assistant United States attorney proffered to the court that the defendant's wife was actually outside running away when at least one of the shots was fired. Okay, so, but that doesn't count as evidence. You said proffered, right? Yes, your honor. Is there evidence on that? There is no evidence about exactly where she was standing and exactly where he pointed the rifle. And the reason that there's no evidence is because her reaction shows that we don't know exactly where he pointed the rifle, but we know that he pointed it in a manner that scared her so much that she turned away from it instinctively and she shielded her baby. But weren't there other neighbors that were scared as well? That were obviously farther away, but they were scared as well, right? Yes, your honor. In the mobile home that's immediately next to the defendant's mobile home, his neighbor Angela Hufflin, she reported that she heard the sound of the gunfire over the sound of her TV. She thought it was so loud to her that she thought somebody had shot into her mobile home. And then it occurred to her that maybe somebody had shot her dog outside the mobile home. And so she went to the door to bring her dog in when she saw the defendant walk by carrying the assault rifle. That goes back to Judge Francis' question. It seems like anyone that's scared is in the zone of danger based on your argument. If you're scared, you hear the gunshot and you become scared. You're in the zone of danger. I don't think a defendant's subjective reaction to the gunfire, whether or not they feel fear, it's not dispositive, but it's certainly probative and it's relevant. And remember, the court is reviewing the district court for clear error. So the question is, is it plausible in this record that the defendant's wife, the defendant's baby, and the defendant's neighbor were put in danger by his reckless gunfire? Can you say what the district court judge said on this point? Let's say it's a clear error review. What is the finding? What's the best thing you could say is the finding on this? Are you asking me what the district court actually found on this, Your Honor? Yeah, exactly. Clear error obviously helps you, but it doesn't help you if there's not a finding. So what's the finding? The district court found that given their proximity in the immediate vicinity of the shots, it was reasonable for the defendant's wife and neighbors to fear death or serious bodily injury from the defendant's reckless AR shots. And forgive me for being clueless about this. Was she engaging with the zone of danger test? She did. The district court judge mentioned using zone of danger. And she's saying it is zone. Of course, we have this problem of we're not quite sure what that means. You can probably tell from our questions. One view is zone is like quite literal. You need evidence of what direction the gun is fired. Another would be if you're so close that you're shielding yourself and people are running haywire, who cares, you don't need evidence of which direction it was fired. And I don't think, I don't understand which one it is. I think there are two Sixth Circuit cases that would really help the court decide this issue. One of them is United States versus Leicester. And in that case, children were in close proximity to the defendant when he fired the gun into the air. And that's all they wanted was close proximity.   In addition, the children fell on the ground. So the court in Leicester is saying that the reaction of the victims to the gunfire can help establish that they're in the zone of danger. That's the Tennessee? It's the same statute? It's the same statute, yes. And the second case. What is the case about the bar where a shot was at somebody in the bar and was not sufficient for the enhancement for the person? Very close, but not in the range or the zone. So that case is Baldwin. It's a Tennessee State case. And the court in United States versus Leicester directly addresses this decision in Baldwin. And the court in Leicester points out that Baldwin was not about implying the enhancement. Baldwin was about a conviction at trial where the standard was beyond a reasonable doubt. And the court in Leicester said, was pretty skeptical about whether or not that same facts, whether the enhancement would not apply to those same facts under a preponderance of the evidence standard. So I mean, I'm just trying to think of the different planes on which this operates. It operates on a plane of numbers of shots. The more reason to think of something. It clearly is relevant if you have evidence of which direction the gun is fired or you can show with the bullet or someone's seeing. And then you think, I think the way you're pitching this is more proximity points in which is I guess the idea it doesn't matter which direction. If you're close enough, what, you could be at risk? You're close enough that the reasonable person would fear for their safety? Is that how you would characterize it? I think in the vicinity, it's a common thread in all the case law. The courts, even the courts that say the reckless endangerment enhancement doesn't apply, they're also careful to say, well, if somebody was in the immediate vicinity, MOOC said that and Tennessee state courts said that in Fox. If somebody was in the immediate vicinity, this case might be different. In the immediate vicinity of the shots. Yes, your honor. Of the shots, of where the bullets are going. I'm just struggling with the fact that this is not, as you mentioned, this is not about whether he has committed a crime. He has been convicted of committing a crime. Now we're talking about when can the government come in and enhance his punishment, right? Yes, your honor. And the burden is on the government to prove that this pretty significant enhancement applies in the particular circumstances of this case. And so I'm struggling with the idea that the response of fear, which is fair, is sufficient to show reckless endangerment depending upon the zone of danger. I think that the key to having a significant level enhancement is that you are in the arena of the zone in which you could be physically in imminent danger. And so isn't that why the burden is on the government to come and show that the imminence of this danger is in the zone of danger? And I'm struggling with seeing that here where the wife does indicate that he was out, doorway he was out shooting outside as opposed to shooting in. Why are we looking at those cases that find bullets somewhere if we're not considering whether you are in imminent danger of being struck? Well, a few responses, your honor. One is that the defendant's wife does not say that he was outside. She says, I don't know. And the reason she says I don't know is because she was so frightened by his reckless gunfire that she turned away and she didn't see exactly where he was. She turned away and she shielded the baby. And she was so close that her ears were ringing. And so I think that that suffices to show that she was in the zone of danger. And it's not the government's argument that anybody who feels afraid by gunfire is in the zone of danger. It's such a fact-specific inquiry here. And if you look at Exhibit 1 and if you look at the defendant's wife's statements to the deputy immediately after this incident happened, you can see what she had to say to the deputy. And you can see how she shows him how she turned away from the gunfire and shielded her baby. And she describes the sound that she heard in her ears. And she tells the deputy that she was afraid he was going to hurt her. And so I think in this case, under these facts, I think that's... I don't know if this is a friendly or unfriendly question, but let's just say... Because the phrase immediate vicinity and zone of danger still has ambiguity in it. The ambiguity is do you need something that shows which way the rifle was pointed. So that's what we're struggling with. What would you do with a case where the spent bullets... Someone actually sees him, he's on the porch, and all he's doing, he literally just fires twice in the sky. Everything else is the same. She hides her face. She's terrified because he's close. But we do have a witness that shows what he did was literally just fire it straight up. What would we say about that case? You could say immediate vicinity, because still very close. He could change his mind. How does that one case work out? So in your hypothetical, Judge, is the defendant's wife inside the... Everything is exactly the same, except we have an eyewitness that shows two shots fired from the porch, both directly into the sky. I think that's still reckless endangerment under the facts here, because as the court said in Maxson, even if... In that case, the court said even if the defendant just shot up into the air while other people were standing around, what goes up must come down. And the roof to a mobile home is not a magical barrier to the entry of a bullet. And so if... Let's pause it. Let's say just a little something to it. Rather than shooting straight up in the air that's going to fall back down, he shoots into an unoccupied wooded area. He just pulls that gun out and shoots two times. Is that good enough? Because now you don't have the bullet might fall down into the house. In your hypothetical, Judge, the defendant's wife is... It's everything's the same, exactly like Chief Judge Sutton's questions. You don't understand where we're trying to get at. We know the witnesses say which direction it went. I'm trying to figure out the immediate vicinity point. You seem to say that doesn't matter because the proximity and closeness makes it reckless. Even if we know the shots were harmlessly fired into a three-mile range with not a... Human beings aren't allowed there, whatever. So what do we do? That would be a much more difficult... Oh, okay. Here we go with that. Don't use that as the answer. That is never the right answer. Your second answer is... Let me point the court to two different cases that addressed a similar fact pattern. And one of them is Lester, which I mentioned the court earlier. The other one is a case called Corbin. And in that case, the defendant fired at a car on a car dealership lot. And this court affirmed application of the enhancement because people were present on the property. There was no indication that he had pointed in the direct... That he had fired in the direction of other people. And so those two cases, I think, would show that this court has a precedent of applying... Of affirming the district court's factual findings in cases that apply this enhancement under facts that are similar here. And your honor, I can see that I'm out of time. May I continue to briefly address the 922G1 issue? I don't think you need to. Okay. So thank you. I mean, I don't think you need to. But what you've done has been very helpful. This is a really hard thing. Like, I mean, the other thing that supports you is when we have our immediate vicinity cases, they probably don't have evidence that says which direction. But it does seem strange that the burden is on the government, right? I mean, that's the thing that's tricky that you would say. You would say proximity satisfies your burden, I think is how you would put it. But I don't know. I think we're going to have to do some research on this. All right. Well, thanks very much. Thank you. We'll hear from your side. My colleague would like to yield the remaining rebuttal time for the sentencing argument. Not a bad move. So the factual findings in this case are reviewed for clear error, but the legal conclusions are reviewed de novo. And here, the district court never made a factual finding as to the direction of the gunfire or that any person was in the direction of the gunfire. So in cases like Lester and some of these other ones, I'm pretty nervous if I go back and read them whether they're all going to have a, and so and so saw the direction of the gun. Or we found the bullet that indicated the direction of the gun. I'm going to be surprised if that's in all those cases. Is it? It is, Your Honor. In Lester, a witness testified to the gun being fired up into the air outside of her home. And the only reason this court deferred to the district court's finding that there was people in the zone of danger is the fact that there were children outside in that immediate area. This is the falling bullets from the sky problem. Yes, because if a gun's fired into the air, the bullets will come back down, so they are in the direction of the gunfire if they're outside. And in the other case, my friend mentioned Corbin. In that case, the defendant had shot repeatedly at a car at a dealership, and a defense witness testified other people were on the property. And their defense counsel requested to withdraw because they saw no meritorious arguments that no one was in danger. But in here, we strongly contest that there are sufficient evidence to show that anyone is in the zone of danger. Because here, the district court only made factual findings that there were other residences nearby and that some individuals inside their homes felt scared. And this court found in Mewkes that the fact that a gun is fired into the air outside of a residence, even where there are people inside, that's not enough to show reckless endangerment. And in citing to, when the district court stated the zone of danger requirement, it cited to state versus Payne. But it did not distinguish between the two separate reckless endangerment convictions in that case, both of which involved high-speed car chases in a residential area, and one of which was reversed because the government had offered no evidence that a single person was outside on the streets or on the sidewalks at the time of the chase. What do we do about the state cases addressing reckless endangerment? Your friend on the other side said, you know, obviously, the burden of proof is different in those cases. So how much reliance should we place on those state cases? So the burden of proof is different in those cases, but they are instructive as to when the zone of danger requirement is satisfied. In Mewkes, that was a sentencing case applying the preponderance of the evidence standard, but it still requires proof that someone is in the direction of the gunfire. And that's why this court reversed, because the government had not offered that proof. And I think State v. Payne makes it very clear that simply engaging in reckless conduct in a residential area under Tennessee law isn't sufficient to satisfy the zone of danger requirement. So this isn't the facts of this case, so it's hypothetical, but what if the evidence showed that the woman in this case had PTSD and was still seeing a psychiatrist because of the shock from the situation, and she was horrified? It turns out, we'll even accept that the evidence proved the gun was not fired in her direction. So in the sense of the bullet, never risk, but horror at what was going on, and that it's sufficient that she's seeing counseling. So in other words, the point I'm getting at is zone of danger with someone who's reckless with a gun may not just be the bullet, right? I would say that would not be reckless endangerment, because she wasn't in imminent danger of death or serious bodily injury from the gunfire. That perhaps could be another offense if there was evidence that he intended to scare her or something like that, but here we're only dealing with the reckless endangerment by the virtue of these two shots fired. And there's no evidence in this case that the shots were ever fired toward any person or that he ever pointed the weapon at any person at all. All right. Boy, you've exhausted us. Great job. So thank you very much to all three of you. Terrific briefs. Great argument. You guys are on your way. Don't get worse, because you're really good already. So thank you to the University of Cincinnati. We really appreciate the clinic's work, and this was a really terrific argument. As you could tell, we were really engaged. We weren't faking it. This was a really good case, and you guys did a great job. And thank you, as always, to the government for answering our questions. So thank you. The case will be submitted.